IN STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 17-mj-01101-CBS-1

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JOHN KELSEY GAMMELL,

Defendant.

---

Proceedings before CRAIG B. SHAFFER, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 2:20 p.m., June 5, 2017, in the United States Courthouse, Denver, Colorado.

---

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

---

APPEARANCES

JULIA MARTINEZ, Attorney at Law, appearing for the Government.

ROBERT PEPIN, Attorney at Law, appearing for the Defendant.

---

AUDIO RECORDED PRELIMINARY, IDENTITY AND DETENTION HEARING

P R O C E E D I N G S

(Whereupon, the within electronically recorded proceedings are herein transcribed, pursuant to order of counsel.)

THE COURT: Now let's call 17 -- is this still an mj case?

UNIDENTIFIED SPEAKER: (Inaudible), Your Honor?

THE COURT: Yes.

UNIDENTIFIED SPEAKER: Your Honor, for your purposes, I don't think that case number has changed, but it has been indicted. I have a copy of the indictment for Your Honor. Mr. Pepin, are you representing Mr. Gammell?

MR. PEPIN: I am here for Mr. Gammell, Your Honor.

THE COURT: And have you received a copy of the indictment?

MR. PEPIN: I did.

MS. MARTINEZ: I think your clerk is printing a copy for me.

THE COURT: Well, that wouldn't surprise me because she is far more organized than I am. All right.

Mr. Gammell, I want to point out a couple of things.

When we were together last, the government was proceeding through a criminal complaint. That criminal complaint alleged a violation of Title 18 United States Code

Section 1030(a)(5)(A). The -- okay. The indictment that was filed in the District of Minnesota charges you with the same violation.

So, again, sir, you understand the maximum penalty can be imposed if you are found guilty of this offense?

MR. GAMMELL: Your Honor, with all due respect, sir, I have no idea what this sentence would carry -- or I have no idea what the penalty would carry.

THE COURT: Well, that's why at your initial appearance, sir, I specifically told you the maximum penalty for violation of this statute is not more than ten years in prison, a fine of not more than $250,000 or both, not more than three years supervised release and a $100 special assessment fee.

The charge against you, the charge that was included in the criminal complaint has not changed. In that respect, your case is still in the same posture as it was before. The only significant difference is, as I told you, when the government proceeds by criminal complaint, a defendant is entitled to a preliminary hearing. Where the government proceeds by indictment, a preliminary hearing is not required because the grand jury has already found probable cause. So that's the practical procedural difference between what your case was when we were together last and where it is today.

Now, Mr. Pepin, I will certainly follow your lead.

Have you had a chance to review the indictment of your client?

MR. PEPIN: I did.

THE COURT: I know we've covered some of this already, but would you request any further advisement?

MR. PEPIN: It's not necessary, Your Honor.

THE COURT: Do you want to proceed with an arraignment at this point?

MR. PEPIN: I'm not sure, this not being this district --

THE COURT: Right.

MR. PEPIN: -- the district, that we're going to be entering a plea of not guilty or guilty at this point.

THE COURT: But I do -- the point here, Mr. Gammell, is I originally set this matter for an identity hearing, a preliminary hearing since the government is proceeding by a criminal complaint, and a detention hearing. I no longer have to have a preliminary hearing for the reasons stated.

Now, I have a form here, all kinds of forms here. I have a form here which indicates the defendant wishes to waive his right to an identity hearing.

Now, Mr. Grammell, did you sign this waiver form?

MR. GAMMELL: Yes, sir, I did.

THE COURT: Now, before you signed the waiver form, did you read it over thoroughly?

MR. GAMMELL: I did.

THE COURT: And did you have enough time to discuss this with your lawyer?

MR. GAMMELL: I did, yes.

THE COURT: And now, you understand that the purpose of the identity hearing is to protect your rights because if the government has arrested the wrong person, then I have no further business with you. Waiving your identity hearing guarantees that, one way or another, you will be going back to the District of Minnesota to deal with whatever proceedings exist.

Do you understand?

MR. GAMMELL: I do. Your Honor, I think it highly unlikely that any evidence could ever be presented that I am not the person that has been indicted, and I would rather not waste the Court's time and judicial resources when I am, in fact, Your Honor, that I am the one who has been indicted.

THE COURT: Well, don't worry about -- Mr. Grammell, I'm more interested in you protecting your rights. Don't worry about wasting my time. Lawyers come into my courtroom all the time to waste my time. It's part of my job description.

MR. PEPIN: And ours.

THE COURT: So don't worry about it. I'm most concerned that you protect your rights. Now, if you want to waive your rights to an indemnity hearing, you can, but please don't do it out of some sense of obligation to me because that's the farthest thing from my mind.

MR. GAMMELL: I don't see any advantage to myself, Your Honor, in requesting an identity hearing because I am the person who has been indicted.

THE COURT: That's fine. And I will find the defendant has knowingly and voluntarily waived his rights to an identity hearing and I will accept that waiver.

Now, that brings us finally to the question of detention. Now, let me state, for the record, that I have reviewed the pretrial services report. I will take judicial notice of the information in that report.

What is the government's position with respect to detention?

MS. MARTINEZ: Your Honor, we are seeking detention. We're seeking detention for a number of reasons, arguing that this defendant is a danger to the community and also that there is a risk of nonappearance, although primarily focused on his danger to the community. That danger is in two respects. One relates directly to the charged conduct and to evidence of related conduct, conduct related to the charged conduct.

As Your Honor is -- perhaps knows, from reading the affidavit submitted with the compliant which is now -- he (inaudible) indictment, but nonetheless, it's the same facts and the same charge. The defendant is charged with a number of -- well, one count -- but that relate to a number of DDOS, Distributed Denial of Service Attacks, on two websites for one Minnesota company: The Washburn Computer Group where this defendant was employed. These DDOS attacks extended over the course of approximately a year.

DDOS attacks are essentially attacks on a website that make it inoperable. That can result, as Your Honor can imagine, depending on the company or the entity behind the website, on anything from an inconvenience to a serious financial loss.

In addition to the attacks on this particular company, through the course of the investigation, the FBI obtained a search warrant to search Mr. Gammell's email account, found evidence that he had engaged in a number of related activity, include -- expressing interest in or making purchases from seven different websites that offer DDOS for-hire services.

Of those seven different websites, there was one that came out that appeared to be his favorite that he engaged with most commonly. And as detailed in the complaint, an analysis of records from a database from that

service matching up with evidence from the email account and evidence obtained in other matters throughout the investigation related to Mr. Gammell showed that between June 5 and June 20 -- I'm sorry, June 5, 2016 and July 5, 2016, Mr. Grammell launched DDOS attacks on approximately 20 different IP addresses. Those related to financial institutions, government organizations, including two court websites, and there was a separate court website where the attack was denied because it was a .gov website, industrial manufacturing companies, employment contracting companies.

Your Honor, the defendant's activities, the defendant's criminal activities with respect to these DDOS accounts, they're sophisticated and they're persistent. They occurred over the course of over a year and to a wide of variety of victims.

So although he is charged with the one count relating to Washburn -- the Washburn Company in Minnesota, the evidence that is contained in the complaint and that the FBI has shows that he has been -- he has been doing this persistently, and it is sophisticated.

He used, for example, with respect to Washburn, one of the reasons it took a while to identify who was behind the attacks is that he used a VPN to hide where it was coming from, required relative sophistication in order to use that anonymizing service so that the company and then the FBI

couldn't see where that attack was coming from, although they ultimately were able to trace it. Similar types of services were likely used in the other DDOS attacks that he launched on the government websites, financial institutions, and other companies.

Your Honor, I understand that Pretrial Service is recommending release to a halfway house. We have concerns about that. The availability of Internet is everywhere.

This defendant is clearly a sophisticated computer user; he's sophisticated at Cyber attacks. His access to any of computer or the Internet gives him the ability to launch attacks like this on anyone who has angered him.

In this case, the charged victim is someone -- is a company that he used to work for and he apparently had some sort of dispute with that company. If he is released, that leaves other possible victims open to similar attacks from the defendant.

So that's one reason that we argue that there is danger of community to releasing this defendant.

The other has to do with a combination of his criminal history, which -- which is old, but also his apparent and recent strong interest in obtaining firearms.

Now, part of the defendant's criminal history is two convictions for being a felon in possession of a firearm, and that his most recent felony conviction. And he served --

well, he was sentenced to 188 months on that particular conviction.

Your Honor, in analyzing the search warrant returns, which form some of the basis of the -- of the evidence against the defendant, the FBI also uncovered in that same email account that this defendant has been trying persistently over the past several months -- well, persistently at the point of time when the email was returned, which was in September, to obtain firearms through straw purchasers and to obtain firearm parts.

So there is email traffic showing that, showing his -- him reaching out and purchasing parts and components, reaching out on websites, and on message boards asking others to buy firearms for him.

In addition to that, when he was arrested, his hotel room was searched, pursuant to a search warrant obtained in this Court. Within that hotel room, there were firearm components found, including two AR-15 receivers, which are prohibited parts. Having those parts, in and of themselves, is illegal, is a felon -- is a federal crime because he is a felon.

There were also receipts in his hotel room showing his purchase of other components. Those were receipts from online stores. Those receipts showed that he had shipped firearm components, both to where he used to live in New

Mexico and also here in Colorado, to his employer.

The FBI has visited his employer, has spoken to his employer and learned from his employer that he has some property there at the employer's -- at the business there.

The FBI hasn't had a chance to examine all of that property, but one thing that the employer did pull out of his desk was a box of ammunition. So we have ammunition at the desk -- at the employer here in Colorado. We have the AR receivers at the hotel in Colorado. We have attempts to obtain firearms.

His father apparently purchased a handgun for him, has told the FBI that. When the FBI visited his father's home, they found the case for that handgun. And the father said that he had purchased the handgun for his son not long before his son left. I think presumably that means left to come here to Colorado.

That handgun to date, as of right now, has not been recovered and we have -- we would assume that it's probably here in Colorado, given that he obtained it before he came to Colorado and the case was left behind, but yet it has not been recovered. It was not recovered at the hotel room.

When Mr. Grammell was interviewed at his arrest, he informed the FBI that he had a friend whom he declined to name who could help him put together -- use these components to manufacture a firearm. So he has shown a persistent

interest in obtaining access to a firearm.

In addition to that, other records of the FBI showed that in the past short period of time, he purchased approximately 25 magazines for a -- for a different type of firearm. Of those with the search warrants that have been executed so far, only 15 of the 25 have been recovered. So there is -- there are outstanding firearm-related components that Mr. Gammell potentially has access to.

Another example of that is a Westminster arms dealer where there was a receipt obtained from the search warrant showed that Mr. Gammell had purchased firearms components. A visit to that store showed that the -- those components weren't in stock at the time that he purchased them and they had since come into stock and so the store was holding them for Mr. Gammell.

And again, these are based on a pretty quick investigation with a search warrant that was executed last week when Mr. Gammell was -- was arrested. And all of this shows ample evidence of significant attempts by Mr. Gammell to get his hands on a firearm and one firearm that we know he had recently that remains missing.

Combined with his somewhat violent criminal history, which albeit it is dated -- but robbery, aggravated -- let's see, we've got aggravated robbery and burglary, a drug conviction, and then two felon-in-possession

convictions -- suggest that Mr. Gammell is very focused on obtaining a firearm. We don't know why, but we suggest that that shows a danger to the community as well.

And then, Your Honor, we do think that there is a risk of nonappearance. We recognize that the criminal history is old; it's dated. He has been released from his most recent conviction, that was in 2006, and his supervision terminated in 2010. However, prior to his more recent conviction, he had a couple instances of nonappearance, a bench issue that had to be -- bench warrant that had to be issued in 1992.

And, Your Honor, we would also argue that with two convictions for a felon-in-possession of firearm, one for which he served significant time, his recent efforts to obtain a firearm, despite knowing full well that he is a prohibited person -- and I'll add that we have emails from his email account where he acknowledges that he is prohibited from obtaining a firearm -- really do show a lack of respect for the law.

The combination of these Cyber techniques that Mr. Gammell has and the way that he has victimized victim companies and could victimize others with access to the Internet and computers, coupled with this strong interest in obtaining firearms, possible access to firearms currently and firearm components, and a friend who could manufacture

firearms, we think there is no combination of conditions that could reasonably protect the public and also secure his appearance, either for further proceedings in this court, or, more pertinently, in Minnesota where he is indicted.

THE COURT: Mr. Pepin.

MR. PEPIN: Thank you, Your Honor.

Mr. Gammell would like to be released, as per the recommendation of the probation department, and then be allowed to travel as need be to and from to Minnesota to face the charges that he has now been indicted for.

And I guess the -- the handful of things that struck me as counsel was commenting are the following:

I didn't -- let me first address basically the criminal history.

I certainly recognize that he has a criminal history with some instances of violent crimes. And as you can see, the last of those would be -- I'm assuming we're not talking possession of burglary tools. That was dismissed. The last one would have been, let's see, 1990 -- well, the burglary is in 1983 when he was 21. The robberies are before that. He is clearly far from 21 at this point. The possession of firearms instances don't seem to have any suggestion that there was a violent aspect to them in terms of their use or anything along those lines.

And so while I recognize that that is always

hanging about as a cloud over someone's record later on, I think it's important to point out that he goes to prison to serve this 188-month sentence, which was rendered in 1992, and then was given five years of supervised release. And from the record that I have anyway -- and I know it's the same one, the case the Court is looking at -- he completed supervision. So he did exactly, or at least as near as we can tell, close to exactly everything he was supposed to be do while being supervised by a probation department, which I guess, or I would expect would have very similar characteristics to the folks who would be supervising him here and/or in Minnesota. And judging from what I know of our supervised or our probation department, probably better.

And so I think that what we really have here is a pattern of someone who can, indeed, follow the rules. He may have stretched things at one time or another or maybe even significantly, I don't know. And clearly, this business about the seeking weapons and reaching out about them -- and I haven't read the emails, I don't know what they really say. Certainly the fact that they might be -- he might be involved with the components of weapons would be troubling, but I'm not sure how any of that is not addressed by putting him in the community corrections facility where he -- and restricting him from using computers and putting him on a GPS system so they know where he is and then letting him go about

the business of -- of taking care of the -- the now mess that he has in Minnesota.

And I -- the -- the hacking situation, it's -- he may be facing other charges with regard to that. Clearly, they have hurried right through this particular indictment so that we wouldn't be dealing with a preliminary hearing today. But if he is not on a computer and not allowed to have a computer-like device and we know where he is at any given time, then that's not going to be a continuing issue, at least not while he's on supervision. And same with the gun aspects of this.

So we're going to ask that he be released to the halfway house as recommended by the probation.

THE COURT: Okay. Give the government, the last word.

MS. MARTINEZ: Your Honor, I just want to emphasize that, given this defendant's sophisticated knowledge of computers, computer use, and Cyber attacks, and his disrespect for the law in persistently attempting to obtain firearms, we would suggest that it would not be sufficient to release him to a halfway house. Even if he were ordered to not have access to computers or to the Internet, there would be no realistic way to ensure that he had no access to Internet or to the computers.

The way that he performed these DDOS attacks

previously by using a virtual private network, a VPN, hides his identity, it masks where that attack is coming from, means he could commit that attack from a public computer, from a library, from a friend's computer, from any location he is allowed to be while he is staying at this halfway house, if he continues to work, from an employer's computer, et cetera. And he could do it in a way that would mask where that attack is coming from. It would make it very difficult for this Court or for Pretrial Services to have any idea that he's violating that term.

In addition to that, Your Honor, we have a missing handgun. And someone who has been convicted twice over being a felon in possession, who has recently shown a strong interest in getting access to a firearm and who had firearm components which were illegal for him to have as recently as last week, in addition to a plethora of other evidence about his attempt to obtain a firearm, this man is a danger to the community and a halfway house simply won't suffice.

Thank you.

THE COURT: All right. Again, I appreciate the arguments of counsel. I have reviewed the Pretrial Service report, I have reviewed the entire file, such as it is, and I appreciate Pretrial Services work, and I don't disregard their recommendation. But there is no way, in my opinion, that I can release this defendant to a halfway house.

And let me try to explain exactly what my reasoning is.

Whenever I release a defendant, I'm essentially releasing him on the assumption that I can set conditions that will reasonably ensure the defendant's appearance for further proceeding and reasonably assure the safety of the community.

Now, I'm not so naive as to think that I can ever do those things without some uncertainty. So fundamentally, the challenge that I have is making a determination, based upon the limited information available to me, whether there are sufficient indicia that give me confidence that the defendant will comply; that the defendant will, in fact, remain available for the proceedings here or in Minnesota; and also reasonable assurance that the defendant will essentially not pose a danger to the community.

My concerns in this particular case are as follows:

First of all, the defendant's ties to the District of Colorado are almost negligible. As far as I can tell, he has only been living in the state of Colorado for approximately three months and he is residing in a location which is about as transitory as you can possibly get.

There is no indication available to me at this point that would suggest that the defendant could return to his former employer, (inaudible) Inc, there has been no

suggestion that that job will continue to be available, based upon most recent events.

So practically speaking, the defendant doesn't really have significant ties in the District of Colorado at all.

Now, I understand the defendant's father lives in New Mexico. I also understand that he has two siblings that live in the District of Minnesota. I don't know what other ties, if any, that he has to the District of Minnesota. I don't know, save for this criminal case and those two siblings, what ties the defendant would have that would cause him to want to go back to Minnesota to deal with this offense.

So I've got a situation where, as far as I can tell, he doesn't have substantial ties to anyplace. He could be best described as a fairly migratory individual.

I also, in determining whether or not there is sufficient indicia of trust to suggest that the defendant could be released on bond, I have to note that the defendant has in the past used at least one alias name. He has in the past used false identification.

That would cause me sufficient trouble, in and of itself; but that fact coupled with the anonymity and the alleged nature of this offense suggest, again, a rather strong ability to be as transitory and as amorphous as you

could possibly be. That doesn't give me any confidence at all.

The defendant's pretrial services report also indicates that the defendant has a history of mental health issues, including bipolar disorder, antisocial personality disorder, and manic depression. All of those factors also have to go into my determination as to how likely will it be that this defendant is going to comply with the condition.

Now, I readily acknowledge, as both the government acknowledged and defense counsel highlighted, that the defendant's criminal history is rather dated. It's significant, but it is dated. But even the dated nature of this -- of these criminal events causes me some concern, because I would like to think, perhaps naively, but think, nevertheless, when a defendant is convicted of the same two felonies, there is some learning process that kicks in.

At some point I would like to think that having been convicted twice of the same offense, someone intent on playing by the rules would understand that that's prohibited conduct.

So while his previous convictions for felony in possession are rather dated, the government has presented evidence suggesting that there may not have been a strong learning lesson conveyed here. And that, again, doesn't give me much confidence that this defendant will comply with the

conditions that I set.

And finally, in this day and age, given the ubiquitous nature of technology, given the ability to get on the Internet through a myriad of ways, I am particularly troubled by the nature of the charged offense.

Let me emphasize. The defendant is absolutely unequivocally presumed not guilty, but the Court cannot disregard the nature of the charged offense and the potential harm that could arise if probable cause occurred, even while the defendant was on bond.

So for the following -- for those reasons, I find there is no combination of conditions that I could set that would reasonably ensure the defendant's appearance for further proceedings.

For that reason, I'll remand the defendant back to the custody of the United States marshals, directly be held in custody. And I will sign a commitment order directing the defendant be transferred to the District of Minnesota for further proceedings.

However, let me also emphasize, I don't know, I absolutely don't know the defendant's ties to the District of Minnesota. I am not prepared to presume that the defendant cannot demonstrate to the United States District Court for the District of Minnesota the conditions can be set because of ties.

So, Mr. Gammell, what I'm saying is that under the Damon Dunbar Act, the defendant can always ask a court to reconsider questions of detention based upon new information that was not available.

Mr. Pepin does not know the circumstances of your ties to the District of Minnesota. It may very well be that a court in Minnesota can find, based upon that significant distinction, that conditions can be set.

So while I'm ordering that you to be detained, my order of detention will specifically say that you are reserving your right to raise the issue of detention again when you return to the District of Minnesota and I would expect the court in Minnesota to entertain that request.

But for now, I have to operate on the information that I have available to me and on that basis, I'll remand the defendant back to the custody of the United States marshal.

Thank you.

(Whereupon, the within hearing was then in conclusion at 2:48 p.m.)

I certify that the foregoing is a correct transcript to the best of my ability to hear and understand the audio recording and based on the quality of the audio recording from the above-entitled matter.

/s/ Dyann Patterson June 16, 2017
Signature of Transcriber Date